## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | | |
|---|---|---|
| WAYNE LIVINGSTON, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Case No. 07-2202 |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

In November 2006, Administrative Law Judge (hereinafter "ALJ") David Thompson denied Plaintiff Wayne Livingston's application for social security disability insurance benefits and supplemental security income.  The ALJ based his decision on a finding that Plaintiff cannot return to his past relevant work but he is capable of performing work that exists in significant numbers in the national economy.

In November 2007, Plaintiff filed a Complaint (#3) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration denying benefits.  In April 2008, Plaintiff filed a Motion for Summary Judgment or Remand (#12) and in June 2008, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#15).  After reviewing the administrative record and the parties' memoranda, the Court now recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment or Remand **(#12)** be **GRANTED.**

## I.  Background

### A.  Procedural Background

Plaintiff applied for social security benefits in October 2004, alleging disability beginning August 17, 2004.  The Social Security Administration denied Plaintiff's application initially and upon reconsideration.  He appealed and ALJ Thompson held a hearing in August

2006.  Plaintiff was represented by an attorney at the hearing.  In November 2006, the ALJ denied Plaintiff's application for benefits based on findings that Plaintiff was not disabled within the meaning of the Social Security Act because, although his non-Hodgkin's lymphoma and dysphagia constitute severe impairments, they do not meet or equal any of the impairments listed in the Regulations and Plaintiff retained the capacity to perform light work.  Therefore, the ALJ concluded Plaintiff could perform jobs that exist in significant numbers in the national economy. In September 2007, the Appeals Council denied Plaintiff's request for review and Plaintiff subsequently appealed the decision to this Court.

### B.  Plaintiff's Medical Background

Plaintiff was 44 years old in October 2004 when he applied for disability benefits and 46 years old at the time of the hearing.  He completed a high school equivalency degree while serving in the Indiana National Guard.  He has worked as a maintenance worker, glass installer, and vending machine worker.  (R. 153-54.)  His past positions as glass installer and vending machine worker are classified as medium physical exertional level, and the maintenance worker position is classified as heavy physical exertional level.  (R. 153-54.)  Plaintiff states that he became unable to work on August 17, 2004, due to neck pain, difficulty swallowing, and chemotherapy treatment.  (R. 82.)  Plaintiff was diagnosed with non-Hodgkin's lymphoma and underwent chemotherapy between October 2004 and January 2005, at which time he began radiation therapy.  (R. 158; 195; 206; 216.)  Since that time, Plaintiff has had difficulty swallowing and has undergone repeated treatments for dysphagia (difficulty swallowing). (R. 253; 256; 258-59; 349; 407.)

The following background is taken from the record, which includes medical records from August 2004 to October 2006.

Dr. Reid Sutton, Plaintiff's family physician, treated him for headache, sore throat, and difficulty swallowing beginning in January 2004 and prescribed prescription painkillers. (R. 185-191.)  In August 2004, Dr. Sutton referred Plaintiff to Dr. Michael Smith, an otolaryngologist, to biopsy a mass in his neck.  (R. 168.)  This procedure revealed cell

2

abnormalities.  (R. 172.)  An additional biopsy in September 2004 revealed malignant large B-cell lymphoma, known as non-Hodgkin's lymphoma, at the base of Plaintiff's tongue and in his left neck.  (R. 181-82; 195.)  Dr. Smith also noted that Plaintiff has an "incredibly active gag reflex."  (R. 169.)

In October 2004, Dr. Sutton referred Plaintiff to Dr. Sang Yoon Huh, an oncologist, and Plaintiff began chemotherapy treatment.  (R. 236-38.)  He continued with chemotherapy until about January 25, 2005, and then began radiation treatment.  (R. 206.)  Plaintiff received follow-up radiation and chemotherapy at Paris Community Hospital from August 2005 through October 2005.  (R. 273-334.)  In August 2005, Dr. Huh reported Plaintiff experienced frequent headaches, difficulty sleeping, and hot flashes.  (R. 287.)

In January 2005, State agency doctor Stanley Burris completed a residual functional capacity (hereinafter "RFC") assessment.  Dr. Burris stated Plaintiff was receiving chemotherapy treatment and was tolerating it without weight loss or fatigue.  (R. 203.)  He reported that, on January 13, 2005, Dr. Huh stated Plaintiff would need only one more chemotherapy treatment before beginning radiation treatment.  (R. 203.)  Dr. Burris further opined that "claimant should be able to do light work" by August 2005.  (R. 203.)

In March 2005, Dr. Huh and Dr. Scott Ackley, a radiation oncologist, completed Neoplasm Reports for the Bureau of Disability Determination Services.  Dr. Huh indicated that Plaintiff was continuing radiation treatments and they were controlling the cancer's growth. (R. 227.)  Dr. Ackley opined that, although Plaintiff had "significant weight loss, night sweats and weakness at the time of his diagnosis," chemotherapy and radiation were working and he hoped Plaintiff would recover within a few months.  (R. 248.)

In May 2005, Plaintiff began seeing Dr. Chiangjian Chen, a gastroenterologist.  (R. 253.) Plaintiff complained of feeling like something was stuck in his throat.  Dr. Chen opined that this could be due to injury to the esophagus as a result of chemotherapy and radiation treatments. (R. 254.)  He performed three esophageal dilations between May and July 2005 to widen

Plaintiff's esophagus and ease swallowing.  (R. 255-58.)  Plaintiff stopped seeing Dr. Chen in July 2005 due to problems with his medical coverage.  (R. 444.)

In July and September 2005, Plaintiff saw Dr. Ackley for follow-up.  (R. 266-67.) Dr. Ackley noted that Plaintiff's "continued weight loss [was] of concern in terms of recurring disease but is most likely related to his swallowing difficulties."  (R. 267.)  He reported Plaintiff felt relief from the esophageal dilation treatments for approximately two weeks before his trouble swallowing recurred.  (R. 267.)

In August 2005, 12 months after the alleged onset date, Plaintiff began seeing Dr. James Van Popering, a gastroenterologist.  After his initial consultation, Dr. Van Popering opined that Plaintiff "probably [has] oropharyngeal motor dysphagia" not likely caused by radiation esophagitis.  (R. 271.)  In October 2005, Dr. Van Popering discovered a possible cricopharyngeal achalasia by radiograph and suggested referring Plaintiff to Dr. James Malone, a surgeon.  (R. 269.)  In November 2005, a swallowing study revealed a narrowing of the lumen at the C6 level, consistent with a prominent cricopharyngeus muscle.  (R. 350.)  In December 2005, Dr. Malone operated on the cricopharyngeal muscle to widen the airway and correct Plaintiff's dysphagia.  (R. 349.)  Surgery did not substantially relieve Plaintiff's symptoms and Dr. Van Popering continued performing esophageal dilations.  (R. 407.)

Dr. Sutton stated that Plaintiff weighed 192 pounds in February 2002.  (R. 472.)  In August 2004, Plaintiff weighed 187 pounds.  (R. 190.)  Plaintiff's weight dropped to 174 pounds by October 2004, when he began chemotherapy.  (R. 234.)  After chemotherapy treatment, Plaintiff weighed about 192 pounds.  (R. 229.)  By May 2005, Plaintiff weighed 173 pounds. (R. 253.)  In July 2005, Plaintiff weighed 160 pounds and he consulted Dr. Sutton specifically because he was concerned about the abnormal weight loss.  (R. 465.)  In October 2005, Plaintiff weighed in at 158 pounds.  (R. 436, 442.)  During this period, Plaintiff underwent several treatments to try to remedy his difficulty swallowing.  His weight continued to vary.

In January 2006, Plaintiff weighed 164 pounds.  (R. 436.)  On July 14, 2006, Dr. Sutton noted that patient had lost 12 pounds in four months, from approximately 180 pounds to 168 pounds.  (R. 451.)  As a result, Dr. Sutton referred Plaintiff to a dietitian and also to another doctor regarding the possibility of placing Plaintiff on a feeding tube.  (R. 451.)  By July 20, 2006, Plaintiff had lost another six pounds and weighed 162 pounds.  (R. 453.)  Plaintiff reported to the dietitian that he ate constantly, but could not gain weight.  (R. 453.)  He reported difficulty swallowing, that the esophageal dilations left his throat feeling coated, and that he was having problems with constipation.  (R. 453.)  Sometime before August 2006, Dr. Duane Haskell placed a feeding tube into Plaintiff's stomach because he was unable to consume enough calories by mouth due to difficulty swallowing.  (R. 454.)  On August 4, 2006, Plaintiff weighed 168 pounds.  (R. 450.)

In addition to the pain in his throat and difficulty swallowing, Plaintiff has consistently complained of neck pain and headaches since 2004.  Between January 2004 and August 2006, Dr. Sutton prescribed Darvocet, Vicodin, and hydrocodone in response to Plaintiff's complaints of a sore throat and frequent headaches.  (R. 184-89; 430-38; 450-53; 464-71; *see e.g.*, R. 434, March 2006, "having headaches all of the time"; R. 437, October 2005, "having headaches - needs pain medication"; R. 464, September 2005, "medicine not working.")  In August 2004, Dr. Sutton referred Plaintiff to Dr. Smith, listing Plaintiff's chief complaint as neck pain. (R. 168.)  Dr. Smith noted that Plaintiff experienced "recurrent swelling" and abscess on the side of his neck that had been previously treated by draining the abscesses.  (R. 168.)  Plaintiff also reported having a "sensation that there was something like a chicken bone stuck in his neck." (R. 168.)  In August 2005, Plaintiff complained to Dr. Huh of frequent headaches.  (R. 287.)  In September 2005, Plaintiff underwent MRI testing of the brain and cervical spine after experiencing constant neck pain and headaches for three weeks.  (R. 394.)  Dr. Tazudeen, a neurologist, concluded Plaintiff's headaches and neck pain were due to "cervical spondylosis," or a pinched nerve.  (R. 394.)  In January 2006, Dr. Tazudeen conducted another MRI of the brain and cervical spine, found "[n]ormal or negative MRI scan of the cervical spine," and prescribed a soft cervical collar for continued neck pain.  (R. 395-97.)  In May 2006, Plaintiff underwent a CT scan of the head and MRI of the brain for his history of double vision headaches

and blurred vision.  The CT scan was mostly normal.  (R. 429.)  The MRI revealed several high
signal intensity foci that "may be attributed to non-specific microvascular ischemic changes or
vasculopathic changes or developing demyelinating process."  (R. 427.)  The radiologist
recommended correlation with clinical findings and other lab results.  (R. 427.)

In August 2006, Dr. Sutton wrote a letter stating that Plaintiff's "health has been
deteriorating progressively."  (R. 458.)  He reported that Plaintiff had received numerous
esophageal dilations as well as surgery to try and alleviate his difficulty swallowing.  (R. 458.)
Dr. Sutton stated Plaintiff lost 15 pounds between the summer of 2004 and August 2006 and
stated that "[Plaintiff] continues to have significant impairments in his health which prevent him
from returning to substantial gainful employment."  (R. 458.)  ALJ Thompson replied to
Dr. Sutton's letter requesting:  (1) specific statements regarding the medical findings supporting
his opinion; (2) copies of all records supporting his opinion; (3) a copy of a written request he
possibly received from Plaintiff's attorney to draft the letter; (4) a copy of notes taken in relation
to the request to write the letter; (5) a statement regarding his opinion of Plaintiff's ability to
perform physical functions; (6) a statement of medical findings supporting his opinion regarding
Plaintiff's physical limitations; and (7) copies of all records supporting that opinion.  (R. 460-
61.)

In October 2006, Dr. Sutton responded to the ALJ's request for a second letter.  (R. 472.)
Dr. Sutton stated that, on one of Plaintiff's first appointments in February 2002, he weighed
192 pounds and had no chronic health problems.  (R. 472.)  After treatment for lymphoma,
Plaintiff "developed esophagitis and difficulty swallowing."  (R. 472.)  As a result, he has not
been able to swallow without pain, has lost weight, and was placed on a feeding tube.  (R. 472.)
Dr. Sutton stated that Plaintiff has lost strength in his back and legs and this "prevents him from
being able to stoop, squat, bend, twist, and lift as he had in the past" and that he "is no longer a
physically strong person."  (R. 472-73.)  Dr. Sutton opined that Plaintiff would be unable to sit
for two hours at a time, that he does not have the endurance to sit, stand, or work eight hours a
day, and that he does not have the ability to focus or concentrate on work.  (R. 473.)  He further
opined that Plaintiff is limited to standing 10 or 15 minutes before experiencing weakness in his

back, hips, and legs, and he cannot lift more than ten pounds. (R. 473.) Dr. Sutton stated that Plaintiff may miss between seven and ten days of work per month because of his medical condition, regardless of the type of work performed. (R. 473.) Dr. Sutton enclosed his medical records regarding Plaintiff's lymphoma, radiation therapy, and difficulty swallowing. (R. 473.)

In September 2006, Dr. Van Popering wrote a letter stating Plaintiff has had trouble swallowing subsequent to radiation and chemotherapy, has "become weak with significant weight loss," and "continues without real improvement of his symptoms." (R. 476.) He stated that tube feeding has prevented further weight loss, but has caused digestive problems. (R. 476.) Dr. Van Popering opined that Plaintiff could not perform his previous work "on a sustained basis," that he may be able to return to work in the future, but he was limited at the time due to fatigue, weight loss, and dysphagia. (R. 476.)

In September 2006, the State of Illinois deemed Plaintiff disabled for purposes of receiving a medical card. (R. 462.)

The record also includes medical records dated after the ALJ's decision. Plaintiff was hospitalized between November 20 and November 22, 2006, due to depression and passive death wishes. (R. 492-633.) Because these records were not part of the record that the ALJ considered in making his decision, the Court cannot consider them when reviewing the ALJ's decision.

## C. Testimony at Hearing

At the hearing in August 2006, Plaintiff and his attorney appeared by video conference. Plaintiff testified that he lives with his wife. (R. 644.) He has four children between the ages of 21 and 25 who do not live with them. (R. 644.) Plaintiff served in the Indiana National Guard for 12 years between 1980 and 1992. (R. 645.) He received a GED while in the military. (R. 646.) Plaintiff is a smoker and testified that he had cut down on smoking. (R. 656.) Plaintiff was on leave from work under the Family Medical Leave Act at the time of the hearing and had not attempted to apply to any jobs. (R. 649-50.)

7

Plaintiff lives in a mobile home and has to climb four stairs to enter.  (R. 644.)  He does not drive because he lost his driver's license due to a DUI approximately six years before the hearing and has not reapplied.  (R. 654-55.)  Plaintiff enjoys watching television and fishing, but testified he could only fish for short periods of time.  (R. 655; 664.)  Plaintiff does not have any other hobbies or do any other daily activities; his wife does all the cleaning and household chores.  (R. 657.)  He testified he is worn out after walking to the mailbox and back, which is a distance approximately the length of a mobile home trailer.  (R. 658.)  In response to questions by the ALJ, Plaintiff stated he could sit for approximately an hour before having to move around, stand for approximately 30 minutes before needing to sit, and keep up any one task between 30 and 45 minutes before having to lie down.  (R. 659-60.)  He testified that he cannot pick up heavy objects like milk because of the feeding tube, but without the feeding tube he could pick up nine pounds or less and bend to pick things up.  (R. 660.)  He cannot walk up stairs or push and pull.  (R. 660-61.)

Plaintiff testified he was 46 years old and weighed about 157 or 158 pounds.  (R. 643.)  He stated he had lost over 30 pounds in the last year.  (R. 644.)  Plaintiff testified he is currently unable to work because he is constantly tired and fatigued.  (R. 653.)  He can only make a few passes with a lawn mower before feeling fatigued.  (R. 653.)  His doctors inserted the feeding tube to see if it would replenish his energy.  (R. 654.)  Plaintiff also testified that the pain affected his ability to concentrate and he is forgetful.  (R. 654.)  He rests between 17 and 18 hours a day.  (R. 664.)

Plaintiff stopped working on August 17, 2004, when he was diagnosed with non-Hodgkin's lymphoma.  (R. 647.)  Plaintiff testified that he stopped working on that particular date because of the multiple surgeries and biopsies required to reach his diagnosis, and then he subsequently started on chemotherapy.  (R. 647.)  He testified that he had chemotherapy treatments every two to three weeks for six weeks.  (R. 648.)  Plaintiff could not remember the exact dates, but his attorney interjected that chemotherapy continued until January 25, 2005.  (R. 648-49.)  After chemotherapy, Plaintiff received between 20 and 30 radiation treatments beginning in February 2005 and continuing five days a week until complete.  (R. 649.)  Plaintiff

8

stated that he went back to work part-time after radiation treatment because of financial troubles, but that scar tissue in his throat required him to go in for dilation treatments and he began consistently missing work because of the throat problems and treatments. (R. 649; 662.) Plaintiff had surgery to cut the muscle in his throat and eventually had a feeding tube inserted because of weight loss and inability to consume enough sustenance. (R. 649; 663.) He also testified that he saw Dr. Chen in May 2005 for severe dehydration. (R. 661.)

The ALJ questioned Plaintiff regarding a possible discrepancy in his income. In 2004, Plaintiff earned approximately 80 percent of his previous year's income. (R. 650.) He testified that in addition to regular pay, he received a disability insurance claim of $2,100 and vacation pay. (R. 650.) In 2005, Plaintiff earned approximately $7,300. (R. 650.) Plaintiff stated he worked three hours a day, five days a week until the doctors told him not to lift anything due to deterioration of the bones in his cervical spine. (R. 651.) Plaintiff testified that he worked approximately eight weeks, but could not say exactly, and earned $10.50 an hour. (R. 651.) The ALJ noted a discrepancy between the amount of time Plaintiff allegedly worked and the amount of money he earned. Plaintiff's attorney offered to investigate the discrepancy and get back to the ALJ, but the ALJ stated he would look into it. (R. 652.) Toward the end of the hearing, the attorney again offered to contact the employer to clarify how much Plaintiff worked during that period and the ALJ stated, "I'm going to take him at his word that he worked about eight weeks part-time." (R. 475.)

Plaintiff next testified that he is currently taking hydrocodone for pain, Lisinopril for high blood pressure, Flexeril, a muscle relaxant, for his neck, and Xanax to fall asleep. (R. 652-53.) He stated that his side effects from the medications include fatigue and drowsiness. (R. 653.) He also testified to having hot flashes and bouts of dizziness. (R. 665-66.)

A VE, Bob Hammond, also testified at the hearing. The ALJ posed a hypothetical question to the VE asking whether an individual of Plaintiff's background, but limited to light work with occasional climbing of ropes, ladders, and scaffolds, and the need to avoid extreme environmental hazards, would be able to perform Plaintiff's past relevant work. (R. 670.) The

9

VE responded that the hypothetical individual would not be able to perform past relevant work, but would be able to perform other jobs in the economy including pre-assembly printed board positions.  (R. 670.)  The ALJ's second hypothetical question limited the individual to sedentary work with a sit/stand option.  The VE stated that such an individual would be able to perform work as a circuit board screener.  (R. 671.)  The VE testified that an individual who had to miss four or more days of work per month "would not be able to maintain employment."  (R. 671.)  Responding to questioning by Plaintiff's attorney, the VE testified that an individual with 80 percent or less productivity would not be able to perform either the pre-assembly printed board position or the circuit board screener position.  (R. 671-72.)  The ALJ then asked whether there were any positions that such an individual would be able to perform while limited to 80 percent productivity.  The VE responded that the positions of security guard and surveillance system monitor did not require 80 percent productivity.  (R. 673.)  The VE also stated that cognitive impairments like inability to concentrate, inability to identify objects, or poor memory would affect a person's ability to perform these other jobs.  (R. 674.)

### D.  The ALJ's Decision

To be entitled to social security disability benefits, a plaintiff must show that he is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 416(i)(1)(A).  The Commissioner utilizes a five-step sequential evaluation to determine disability:  (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, i.e., one that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the Regulations; (4) whether the claimant has the residual functional capacity to perform past relevant work; and (5) if the claimant cannot perform her past relevant work, whether he can do other jobs that are available in the national economy.  20 C.F.R. § 404.1520(a)(4).  Between steps three and four, the Commissioner determines a claimant's residual functional capacity, that is, the work he is still able to perform despite limitations.  20 C.F.R. § 404.1545(a)(1).  The claimant bears the burden of production and

10

persuasion at steps one through four.  Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment.  *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

       The ALJ followed this sequential evaluation in his decision.  First, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 17, 2004.  (R. 19.)  Second, the ALJ determined that Plaintiff's non-Hodgkin's lymphoma and dysphagia constitute severe impairments, but the record did not show any other severe impairments.  (R. 19.)  At the third step, the ALJ found that these severe impairments did not meet or equal an impairment in the Listing.  (R. 19.)  At step four, the ALJ determined that Plaintiff was severely limited due to fatigue caused by radiation and chemotherapy, but that he regained the capacity to perform light work within 12 months of the alleged onset date.  (R. 19.)  The ALJ found Plaintiff's assertions regarding the extent of his difficulty swallowing, lack of strength, and physical impairments to be not fully credible.  (R. 19-20.)  Because the ALJ found Plaintiff had the residual functional capacity to perform only light work, the ALJ found he cannot return to any past relevant work.  (R. 21.)  At step five, the ALJ found, based on the VE's testimony, that Plaintiff can perform jobs that exist in significant number in the national economy, including pre-assembly work on computer-printed boards.  (R. 22.)  Accordingly, the ALJ found that Plaintiff was not disabled and denied his application for social security benefits.

## II.  Standard of Review

       The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g).  When reviewing an ALJ's decision, this Court considers factual determinations with deference.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).  This Court does not review the findings *de novo* or substitute its own assessment for the ALJ's.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Therefore, if "reasonable minds could differ"

with regard to the Commissioner's findings of fact, then this Court must affirm the ALJ's decision.  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

This Court "will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted).  However, reviewing courts have greater flexibility to review a credibility determination when it rests on objective factors or fundamental implausibilities rather than on the ALJ's subjective observations.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### III.  Analysis

Plaintiff argues that the Court should remand the case to the Commissioner because (1) the ALJ improperly failed to give controlling weight to the opinions of Plaintiff's treating physicians; and (2) the ALJ made an improper credibility finding.  As a result of these errors, Plaintiff contends that (3) the RFC was inadequate and therefore, (4) the hypothetical questions to the VE were incomplete.

### A.  Treating Physicians' Opinions

Plaintiff first argues that the ALJ erred by failing to give controlling weight to the opinions of Plaintiff's treating physicians.  Plaintiff submitted letters from Dr. Sutton, his internal medicine doctor since 2002, and Dr. Van Popering, a gastroenterologist who treats Plaintiff's dysphagia.  In August 2006, Dr. Sutton wrote a letter stating that Plaintiff "has had esophagitis and difficulty swallowing" since completion of radiation therapy, that he continues to lose weight, and that a feeding tube was placed into Plaintiff's stomach to provide nutrition. (R. 458.)  In response to the ALJ's request for additional information, Dr. Sutton submitted all medical records regarding Plaintiff's lymphoma, radiation therapy, and subsequent dysphagia. (R. 473.)  He stated that Plaintiff has lost muscular strength due to weight loss and malnutrition resulting in a need for food supplements via a feeding tube.  (R. 472.)  Dr. Sutton opined that Plaintiff no longer has the ability to stoop, squat, bend, twist, and lift as he did previously, he is not able to sit for two hours at a time, he does not have the endurance for eight hours of work, he has lost the ability to focus, he can stand for only ten to fifteen minutes, and he can lift up to ten

12

pounds.  (R. 472-73.)  Although the ALJ requested it, Dr. Sutton did not provide a copy of any written request he received to write the initial letter, nor did he include any notes taken in relation to the request.  (R. 460.)  Dr. Van Popering opined that Plaintiff could not perform work "on a sustained basis" due to fatigue, weight loss, and dysphagia.  (R. 476.)

The Commissioner argues that the ALJ properly disregarded these letters because they were based on Plaintiff's subjective complaints.  *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (stating that "[a]n ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations").  However, the Commissioner failed to present any evidence or argument to support the premise that the doctors' opinions in these letters were based on Plaintiff's subjective complaints.

The ALJ is required to consider medical opinions based on a doctor's objective observations.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  Moreover, the findings of a treating doctor as to the severity of an impairment should be accorded controlling weight if well supported by the evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (stating that the ALJ will give controlling weight to a treating doctor's opinion as long as it is supported by medical evidence and is not inconsistent with other substantial evidence in the record).  An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  If the opinion is not entitled to controlling weight, the ALJ must evaluate it in light of the factors outlined in 20 C.F.R. § 404.1527(d).  The ALJ cannot substitute his own medical opinion for that of the treating physician or make independent medical findings; he must reach conclusions based on the existing record or question a medical expert to supplement the record.  *See Metzger v. Astrue*, 263 F. App'x 529, 532 (7th Cir. 2008) (stating that the ALJ must explain his rationale by creating a logical bridge between the substantial medical evidence and the conclusion).

The ALJ is permitted to reject a treating physician's opinion when it presents a legal conclusion because the ALJ is solely responsible for determining if a plaintiff is disabled under the Social Security Act. 20 C.F.R. § 404.1527(e)(1). Therefore, the ALJ does not have to consider Dr. Sutton's statements that "[t]he patient became disabled on or about September 2004" or that his impairments "prevent him from returning to substantial gainful employment." (R. 458.) The ALJ is also correct that he does not have to afford any weight to the State of Illinois medical evaluation finding Plaintiff disabled for purposes of receiving medical coverage. 20 C.F.R. § 404.1527(e)(1) (the ALJ determines if claimant is disabled for purposes of Social Security).

However, the ALJ rejected the opinions of Drs. Sutton and Van Popering on the basis that both doctors' letters were "primarily based on the claimant's own subjective complaints" and are "not fully credible" because their primary purpose was to "help [Plaintiff] obtain disability." (R. 21.) He also stated that Dr. Sutton's second letter "was not adequately responsive." (R. 21.) The evidence does not support these conclusions.

First, the ALJ provided no explanation or evidence to back up his accusation that Plaintiff's physicians were motivated simply by a desire to help Plaintiff obtain disability. That a doctor desires to help his patient does not constitute a reason to question the doctor's integrity or assume that he would make misstatements regarding a patient's limitations. An ALJ acts as an advocate for the Commissioner when he draws such conclusions without foundation, and this is contrary to the Regulations. *See Stackhouse v. Chater*, No. 3:95-cv-934RP, 1996 WL 697936, at *11 (N.D. Ind. Nov. 1, 1996) (unreported) (citing 20 C.F.R. § 416.1400(b)) ("[t]he ALJ's role in administrative proceedings is to make an impartial decision as an adjudicator, not as an advocate or adversary, as to whether a claimant satisfies the statutory and regulatory requirements").

Second, the record does not support a conclusion that Dr. Sutton's second letter was unresponsive. Dr. Sutton responded to the ALJ's request by submitting all of Plaintiff's medical records and giving an opinion as to Plaintiff's physical limitations. Dr. Sutton did not provide a

14

copy of the letter the ALJ assumed he received from Plaintiff to write a letter to the ALJ.
Dr. Sutton likewise did not submit notes the ALJ assumed he took when preparing to write the
first letter to the ALJ. Even if Dr. Sutton "was not adequately responsive" as to these particular
requests, the ALJ may not wholly reject a doctor's opinion on that basis. The ALJ must still
consider the opinion and evaluate it consistent with the Regulations. 20 C.F.R. § 404.1527(d).
The ALJ cannot disregard Dr. Sutton's opinions as to Plaintiff's limitations on the ground that
the doctor failed to provide documentation that might, in fact, not exist.

Third, the ALJ did not explain why he concluded that the treating physicians' opinions
were based solely on Plaintiff's subjective complaints and their letters contradict this conclusion.
Both Drs. Sutton and Van Popering state that they based their opinions on Plaintiff's abnormal
weight loss, difficulty swallowing, and resulting loss of strength. The evidence in the record
supports those statements. The record shows that Plaintiff's weight fluctuated and he had lost a
total of 32 pounds between the January 2005 (R. 229, reporting a weight of 192 pounds) and
July 2005 when he weighed 160 (R. 465). Beginning in May 2005, Plaintiff underwent a
number of treatments to alleviate his difficulty swallowing. These treatments did not alleviate
his condition and his weight continued to fluctuate. In July 2005, Dr. Sutton noted Plaintiff's
continuing loss of weight and strength and referred him to a nutritionist and a gastroenterologist.
(R. 271, 453.) Plaintiff has provided a longitudinal record of his difficulty swallowing,
significant weight loss, and malnutrition, and his treatment for those conditions, including
surgery to cut his cricopharyngeal muscle and repeated esophageal dilations. Because the
treating physicians' opinions are not inconsistent with the objective evidence in the record and
the ALJ provides no explanation for his conclusion that the doctors' opinions were not reliable,
the ALJ's conclusion that "both of these letters are primarily based on the claimant's own
subjective statements" (R. 21) is without merit. Accordingly, the Court recommends remanding
this case so that the ALJ can reconsider the opinions of Plaintiff's treating doctors consistent
with the Regulations.

**B.  The ALJ's Credibility Determination**

Plaintiff next argues that the ALJ erred when assessing Plaintiff's credibility.  The Seventh Circuit court has established a deferential standard of review regarding credibility determinations:  Courts can reverse an ALJ's credibility determination only when it is patently wrong.  *Powers*, 207 F.3d at 435.  A credibility determination is patently wrong when it "lacks any explanation or support."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).  When the ALJ's credibility determination is based on objective errors or fundamental implausibilities, courts have greater leeway to review.  *Herron*, 19 F.3d at 335.

The ALJ stated, "the claimant's allegations [are] credible to some degree, to the extent that he has physical impairments which cause difficulty swallowing," but found Plaintiff's claims regarding his lack of strength and other limitations not credible.  (R. 19-20.)  The ALJ provided several reasons for this credibility determination, including the following:  (1) Plaintiff exaggerated his limitations on his ability to sit and stand; (2) Plaintiff's earnings from 2005 were not consistent with his testimony regarding the time he worked; (3) Plaintiff's allegations regarding weight loss are not supported by the record; (4) Plaintiff did not appear to be the weight he alleged at the hearing; (5) Plaintiff's allegations regarding constant fatigue are not credible because he exaggerated his weight loss; (6) Plaintiff's allegations are not credible because his weight has not been an "ongoing" problem since 2004; and (7) Plaintiff did not look "emaciated" at the hearing.  (R. 20-21.)

The ALJ first stated that Plaintiff's "responses to questions at the hearing were often exaggerated."  (R. 20.)  As an initial matter, for the ALJ to conclude that Plaintiff is not credible because his responses are "exaggerated" is a circular argument, not a reason for finding him not credible.  In support of this statement, the ALJ stated that Plaintiff testified he could sit for more than 60 minutes at a time, stand for 30 minutes, but sit or stand for only 30 to 45 minutes.  The ALJ concluded that these responses are inconsistent and therefore unreliable.  (R. 20.)  However, when the ALJ questioned Plaintiff regarding his ability to sit or stand for a period of time, he asked, "if you had, your mind's occupied, you're doing something, you can sit or stand, go back and forth, how long could you do that . . . ?"  (R. 659-60.)  This question apparently deals with

16

Plaintiff's ability to concentrate or stay focused on a task as well as Plaintiff's ability to alternate between sitting and standing for a period of time.  Because of the confusing nature of this question, the Court cannot follow the ALJ's reasoning that it is inconsistent with his other testimony or that it undermines Plaintiff's credibility.

The ALJ's second reason for discrediting Plaintiff is his testimony about his 2005 earnings.  Plaintiff earned a total of $7,301.03 in 2005.  (R. 20; 650.)  He stated that he worked part-time after finishing chemotherapy and radiation treatments, and that he worked three hours a day, five days a week, for approximately eight weeks, at $10.50 an hour.  (R. 656-51.)  Plaintiff stopped working again because he was having problems with his esophagus swelling shut and disc deterioration at C5.  (R. 650-51.)  Plaintiff's attorney acknowledged the discrepancy between the amount of money Plaintiff earned and the amount of time Plaintiff thought he had worked and the attorney offered to investigate the issue.  (R. 651.)  The ALJ declined the attorney's offer and said he would "take [Plaintiff] at his word that he worked eight weeks." (R. 652; 675.)  On that basis, the attorney agreed that the record could be closed.  Nevertheless, in his decision, the ALJ found there was a large discrepancy in the figures and concluded that "it [is] unlikely that the claimant was merely 'mistaken' in the time frames given for his employment."  (R. 20.)

The ALJ had the ability to find out from employment records how much Plaintiff actually worked in 2005 and Plaintiff's attorney offered to research the issue, but instead the ALJ simply assumed that Plaintiff was lying, even after stating at the hearing that he would "take him at his word that he worked eight weeks."  (R. 675.)  Under these circumstances, the Court concludes that the ALJ erred by using Plaintiff's testimony on his 2005 earnings to discount his credibility.

The last five bases for the ALJ's credibility determination all deal with Plaintiff's weight and weight loss.  The ALJ noted in his decision that Plaintiff testified he had lost over 30 pounds, that his inability to consume sufficient nourishment had been an ongoing problem since his treatment began in 2004, and that his current weight was 157-158 pounds.  The ALJ cited evidence that Plaintiff weighed 184 pounds in November 2004 and also stated that Plaintiff's

17

weight at the hearing "must have been closer to 168 pounds." (R. 21.) The ALJ then stated, "[a]s the difference between 184 pounds and 168 pounds is 16 pounds, it is not reasonable that the claimant lost the amount of weight alleged in the previous year. The claimant did not appear emaciated at the hearing." (R. 21.)

The ALJ's observation that Plaintiff did not appear emaciated at the hearing is not relevant to a consideration of Plaintiff's credibility. The medical records speak for themselves and they demonstrate that the ALJ's statement that Plaintiff's weight loss was only 16 pounds is not correct when one looks at the overall effect of Plaintiff's impairments and treatment. The record shows that Plaintiff reached a weight after chemotherapy of 192 pounds. (R. 229.) This is 32 pounds more than his low weight of 160 pounds in July 2005 (R. 465, Dr. Sutton's clinic notes) and thirty pounds more than his weight of 162 in July 2006 (R. 453, nutritional assessment). Thus, the medical evidence clearly shows that Plaintiff's weight fluctuated up to 32 pounds as a result of his impairments and treatment and continues to vary. It peaked after Plaintiff had chemotherapy and declined again when he began having problems with swallowing, to the point that Plaintiff eventually had to have a feeding tube inserted. Plaintiff's weight loss is significant because, as the ALJ noted, it is the basis for Plaintiff's claim that his "swallowing problem has resulted in lack of ability to consume sufficient nourishment, leading to constant fatigue." (R. 20.) When the ALJ rejected Plaintiff's statement that his weight loss was an ongoing problem, he substituted his opinion for Plaintiff's treating physicians' opinions and the clear evidence in the record that the problem had gotten progressively worse. Here, Plaintiff's treating physicians stated that he had gone from a strong, muscular maintenance worker to an individual who is constantly weak and fatigued due to lack of nutrition. (R. 458; 472; 476.) Thus, even though Plaintiff may have underestimated his weight on the day of the hearing, that is not enough reason for the ALJ to reject his claims of fatigue, especially here, where the overwhelming medical evidence supports his claims and the doctors' statements regarding his weakness and fatigue.

The ALJ gave a number of reasons for his credibility determination. However, the ALJ's reasons are either without foundation or contrary to the record. Therefore, the Court finds the

ALJ's credibility determination is patently wrong.  On remand, the Court recommends that the ALJ reassess Plaintiff's credibility.

### C.  Residual Functional Capacity

Plaintiff next contends that the ALJ's RFC was inadequate because of the improper credibility finding and the ALJ's failure to properly consider the opinions of Plaintiff's treating physicians.

In assessing Plaintiff's RFC, the ALJ did not give "significant weight" to the opinions of State agency physicians.  (R. 21.)  He found Plaintiff's testimony to be not credible and stated that Plaintiff's "allegations about his problems were inconsistent with the medical record and were given less than controlling weight."  (R. 21.)  He also assigned "less than controlling weight" to the opinions of Dr. Sutton and Dr. Van Popering and to the medical evaluation from the Illinois Department of Human Services.  (R. 21.)

Nevertheless, the ALJ stated that he gave controlling weight to "[m]edical signs and laboratory findings."  (R. 21.)  He stated that the record established that Plaintiff "was severely impaired for the first several months after his alleged onset date, but regained the capacity for light work activity within 12 months of his alleged onset date."  (R. 21.)  He did not cite to the record to support this particular statement.  However, earlier in the decision, the ALJ stated that he focused on the period beginning one year after the alleged onset date of August 17, 2004, "because an individual cannot receive disability benefits unless the impairments either result in death, or last or can be expected to last for 12 months or longer."  (R. 19.)  The ALJ then stated as follows:

> In this case, medical records show that the claimant was severely limited by his impairment during the first 12 months after his alleged onset date, and by fatigue caused by radiation therapy and chemotherapy.  However, medical records demonstrate that he regained the capacity for a range of light work within 12 months of his alleged onset date.

(R. 19.)  In support of this conclusion, the ALJ referred to the following medical records:

> Studies in May and July 2005 showed mild esophagitis.  In an EGD study in July 2005, the stomach and duodenum appeared normal.  A follow-up EGD in

> September 2005 was unremarkable.  During progress visits to gastroenterologist
> Dr. Van Popering in late 2005, the claimant denied nausea, vomiting, diarrhea or
> constipation.  Imaging in November 2005 showed no recurrence of malignancy.
> Based on swallowing studies, Dr. Malone recommended surgery for hypertrophy
> of the cricopharyngeal muscle, which was completed in late 2005.  EGD studies
> in 2006 continued to show dysphagia, as did progress notes from van Popering
> and Dr. Sutton.

(R. 19 (citations omitted).)  Other than the first two items, the remainder of this evidence cited
by the ALJ does not support the ALJ's statement regarding Plaintiff's physical condition because
it covers time periods *after* the relevant time period as defined by the ALJ ("within 12 months of
his alleged onset date" of August 17, 2004).  Furthermore, relying only on the May and July
2005 medical records regarding Plaintiff's purportedly "mild" esophagitis and his normal
stomach and duodenum grossly mischaracterizes the record by ignoring Plaintiff's ongoing
problems and treatment.

The ALJ's RFC determination appears to based in large part on credibility; namely, that
Plaintiff exaggerated his physical limitations.  As noted above, the ALJ also cites the following
from the record as a basis for finding Plaintiff is capable of light work: (1) Dr. Chen's finding of
"mild esophagitis" in May 2005, (2) Dr. Huh's finding that Plaintiff's stomach and duodenum
appeared normal in July 2005; (3) Plaintiff report that he did not have nausea, vomiting, diarrhea
or constipation in "late 2005" (R. 19); (4) Plaintiff's surgery for dysphagia in December 2005;
and (5) swallowing studies after surgery that showed continued dysphagia. (R. 253; 256; 270;
349; 408.)  The ALJ does not mention that Plaintiff went in for an esophageal dilation the day
Dr. Chen diagnosed "mild esophagitis."  (R. 253.)  Dr. Huh's finding in July 2005 of normal
stomach and duodenum was coupled with a finding of "Grade A nonerosive esophagitis of the
distal esophagus" and Dr. Huh also performed an esophageal dilation that day.  (R. 256.)

The ALJ cannot pick and choose "only that evidence that favors his ultimate conclusion,"
but must consider all of the evidence as a whole.  *Binion ex. rel. Binion v. Chater*, 108 F.3d 780,
788-89 (7th Cir. 1997); *see also Jones v. Heckler*, 583 F. Supp. 1250, 1253 (N.D. Ill. 1984)
(stating the ALJ should not have a "result-oriented" view toward denying disability).  The ALJ
cites medical evidence, but the evidence cited does not create a logical bridge explaining the

ALJ's RFC determination.  There is no evidence, beyond the State agency doctor's assessment which the ALJ acknowledged was outdated, that Plaintiff is capable of light work.  Furthermore, as noted above, the ALJ did not provide an adequate medical reason for ignoring Dr. Sutton's opinion regarding Plaintiff's physical limitations.  As a result, the ALJ impermissibly substituted his medical opinion for that of Plaintiff's treating physicians.  Therefore, on remand, the ALJ should reconsider Plaintiff's RFC, looking at the evidence as a whole, including the treating physicians' opinions regarding Plaintiff's limitations.

### D.  Incomplete Hypothetical

Plaintiff finally argues the ALJ erred by posing an incomplete hypothetical question to the VE that did not include all of Plaintiff's limitations.  As explained above, the Court has concluded that the ALJ erred by determining Plaintiff's RFC because the ALJ failed to give the appropriate weight to the opinions of Plaintiff's treating doctors and erred when assessing Plaintiff's credibility.  Thus, the hypothetical questions were inadequate on that basis.  Furthermore, while the hypothetical question is primarily a repetition of the ALJ's RFC determination, the ALJ is also required to "consider the combined effect of all [Plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  In addition to the fundamental problems with the RFC discussed above, Plaintiff also contends that the ALJ failed to address Plaintiff's limitations related to his headaches, neck pain, and feeding tube.

The record shows that Plaintiff has had headaches since 2004 requiring narcotic painkillers.  (R. 168; 184; 394; 434; 437; 464.)  In September 2005, Dr. Tazudeen diagnosed Plaintiff with a pinched nerve and, in January 2006, he prescribed a soft cervical collar for pain.  (R. 394-97.)  Plaintiff is also currently taking Flexeril, a muscle relaxant.  (R. 652.)  Plaintiff testified that he is constantly fatigued, partly because of the side effects of these medications.  (R. 653.)  Finally, Plaintiff's feeding tube causes additional physical limitations.

The Court agrees that the ALJ did not include any physical limitations related to Plaintiff's headache, neck pain, or feeding tube in the hypothetical questions to the VE.  In fact,

21

the ALJ did not mention these issues at all, so the Court cannot review his reasoning regarding any limitations associated with these problems.  An ALJ is not required to address every piece of evidence.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  However, meaningful review requires the ALJ to articulate his reasons for accepting or rejecting entire lines of evidence.  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  Here, the ALJ did not provide any explanation for failing to consider the evidence regarding Plaintiff's headaches, neck pain, and feeding tube.  On remand, the ALJ is directed to explain his reasoning as to those conditions.

## IV.  Summary

For the reasons set forth above, this Court recommends **GRANTING** Plaintiff's Motion for Summary Judgment or Remand (**#12**) and remanding this case, pursuant to sentence four of 42 U.S.C. § 405(g), for further consideration consistent with this recommendation.

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within ten working days after service of a copy of this recommendation.  *See* 28 U.S.C. 626(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 4th day of September, 2008.

_____
                s/ DAVID G. BERNTHAL
                U.S. MAGISTRATE JUDGE